When you're ready, Counsel. May it please the Court. My name is Darrell Williams. If you could pull the microphone a little closer. Yes. My name is Darrell Williams. Here we go. And with me at counsel table is Mr. Michael Blair, who wrote the briefs in this matter. And I am honored to be here. Rather than a trial court, I rarely appear at a court of appeals level, so if I misspeak or do something incorrect, please yell at me. We're here to argue the propriety of a grant of a motion for summary judgment, when at the trial court below there were cross motions. And while we both agree that the facts in salient part are undisputed, I'm not here to argue the fact that my motion should have been granted, which I would like to do, but instead simply that the trial court was wrong in granting the motion for summary judgment by Honeywell. And your argument is that there's a question of material fact as to whether there was a material breach. Well, more than materially breached, whether or not there was a strict performance which was required because of Honeywell saying, well, they sent out a notice of default, but then they said, well, okay, but if you make a payment by this date, you're okay, which was not done. And then we called them, and they said, well, if you do a payment by this date, you're okay. We made a payment. And then they said, but you've got to strictly comply with the letter agreement sent out by Mr. Roseberry, with which we weren't complying. And then we sent another payment after we had defaulted on what they said was the next payment due. Now, that next payment, which I gather was the last payment. No, it was not. The timeline is that, in fact, I think it appears here in the excerpt of record, item 3G. There is a timeline of records that wire transfer on September 10. Beyond what they said was the cure date. Then a wire transfer on September 27. And it is a wire transfer that Honeywell says they did not believe that they received, but subsequently. This is that one I'm interested in. Okay. Is it right that that one was sent to a different account? Yes, it was. And it turns out that it was. And did you owe money on that account as well? Yes. Did you owe money? Let me say it this way. The money that was sent to that account, was that more than was owed on that account? Yes. It paid off that account in full, plus the total amount necessary to pay the cure payment, the installment payment of cures. And I believe it was within a few days that Honeywell, according to the record, identified that that was an MSP, a maintenance service program payment for cure. In fact, Mr. Roseberry, who sent out the notice of default in October, he acknowledged in his deposition that before he sent the notice of termination in mid-October, he was aware that that payment had been made. And then more shocking to me as a trial lawyer, appellate lawyer, is the fact that after the notice of termination goes out, there's then on October 24, almost ten days later, another $46,000 paid. And then there's another wire transfer in November, two more in November. And by the time we get to the end of January, some $310,000 has been paid to cure and Honeywell's got the money. Now ---- Is that money going to be owed anyway? No. No. I mean, if there's they're going to terminate these contracts, the money is not owed. Moreover ---- Let me stop you there. I had difficulty understanding. My understanding is that the amount to be paid was based on hours of operation. And the impression I got was that it's really payments in arrears. That is, you operate a certain amount, you pay a certain amount. And so the money is going to be owed for the period of time the contract was in effect. Even if it hasn't been paid yet, it's still owed. So at least some amounts would still have to be paid for the contract up to the point of termination, assuming for this purpose that the termination was valid. Well, actually, the contract is, if you don't make the payments, you don't get the maintenance done on your airplane. It's not certainly ---- Well, but what about, I mean, up to the point of termination, to the extent that this contract is something of an insurance policy, the insurance was there even though payments hadn't been made on a timely basis. And there's still a claim by Honeywell for the amount that's due up to the point of termination. Well, with respect, I do not believe that is correct because at that point in time, we were making a claim under one of the policies for maintenance on one of our aircraft. And so if that were true, then they would be obligated to do the maintenance on the aircraft. If you have a claim for maintenance prior to the date of termination announced by Honeywell, I mean, that's a claim that ought to be pursued because Honeywell is saying the contract is in effect up to the termination date. That's not the claim I've seen argued here. Well, of course it's not argued here because that was a claim at the trial level, and we were thrown out of court based upon an appropriate termination of the contract. My point is that if you're going to insist upon a termination date because of nonpayment, then you cannot thereafter or even during the termination period accept payments and continue to accept them and not give them back. You could if the money's due. But the money was not due here. Well, see, that's the point. That's really what prompted the question. I had trouble figuring out exactly what money was due and what money wasn't up to the point of termination. As I said, my review of the contract left me with the impression that payments were being made, what I've described as in arrears based on hours of operation. Well, that is correct. But if you don't operate the aircraft, then you don't owe the money. You're not telling us that you didn't operate the aircraft. As I see this, I look at this and I say, okay, money's due, and payments are being made on a persistently late basis, and Honeywell is insecure as to whether payments are going to be made into the future. So it says enough already and terminates. But if money is still owing, money comes in. If I've rented an apartment to somebody and they still owe the rent, they still owe me the money even if they didn't pay me and they get tossed out. They still owe me for that time. If I get money from them, I can apply it to the debt. That's what people use security deposits for. So I'm hearing you say, well, we paid money and they took it, didn't give it back. So I don't have anything in front of me that tells me that they were required to give it back. Well, of course we don't have anything because there is nothing in the record that indicates anything beyond the catch-up payments was due. Well, and if there's nothing in the record to that effect, I mean, so? Well, here's my response to that. But let me make sure I'm asking the question and so you're answering what I'm asking. I thought I heard you arguing that they were accepting money after the termination date that was future money rather than past due money. But I'm not sure that that's right. That is to say, are we dealing with money that, according to Honeywell's calculation, was due based upon the termination date that Honeywell insists on? That is to say, is this past due money? No. Then why aren't you claiming for that in this appeal now? Even on the assumption that you lose on the termination question, then they owe you the money back. Why aren't you claiming for that? Well, that claim was indeed asserted at the trial level and that claim was dismissed because of the summary judgment. But if that claim was dismissed based upon the termination and that money was owed for things that were owed after the termination date, not as past due money, why didn't you appeal that? Well, it is an appeal of the dismissal of the case because they should not have dismissed it. Let me just hold right there and let me go to something else that I think is very germane to this issue. Honeywell itself admits that under the terms of this contract, if it was terminated, as of late January, they owed us a refund of virtually $300,000. They understood, as did we, that the payments were made for maintenance and you could at any time under this agreement stop making payments. The only thing that you lost if you did that was the ability to have Honeywell thereafter pay for the maintenance on the engines. This is a voluntary program that you have. This does not obligate you to pay Honeywell because Honeywell's remedy is you're not current, we're not going to pay. We're not going to do the maintenance. And, indeed, Honeywell's modus operandi in circumstances like this was, is that, as we know from the record, something like 50% of all people who have these types of contracts are delinquent when they take the plane in for maintenance and they simply catch up on the payments, then Honeywell pays for the maintenance. And so this is not your typical renting an apartment situation where, irrespective of what happens, you're obligated to pay the payment. No. This is, if you want the maintenance, you have to make these payments and then we will pay for it. It is not, it was in service and, therefore, you must pay for it. The salient point to me --" I have to tell you, I analogize it more to an insurance policy, and saying after the fact, well, we didn't have an accident so I don't need to pay for the insurance up to the point of termination, is not, to me, a very persuasive argument. Up to the point of termination, since your client had the power, clearly had the contractual power to force Honeywell to pay for claims prior to that date, the notion that, since you're insisting it's not terminated, the notion that you can decide to walk away from an obligation up to that date is not one that, on its face, strikes me as very persuasive. And certainly that was not our position. Our position was that we had an agreement that they were working with us and we with them to bring ourselves current so that they would pay for the maintenance on our aircraft. And that's what we were doing, and they were accepting those payments, and even after they purported to terminate, they kept our money, and there is right now some $100,000 to $179,000, which they've misapplied in our view. But whether that money is owed or not is not in front of us? No, it's not, because that would be at the trial level if this case is reversed. That was a claim at the trial level which was made, and it's contained in the record here. What if it's not reversed? What's your situation? Well, you know, my situation is I have a client in Mexico City who just was morted. All right. But it's not reversed? You're just walking away from that money? There is nothing left of our claim for that money. It was dismissed. No, that doesn't make any sense to me. It makes no sense to me either. No, your argument doesn't make any sense to me. That is to say, if the termination was proper and you lose on that ground, I think you're telling me they owe you X amount of dollars because this was paid for obligations after the termination date. Yes. But you're not claiming for that. You're walking away from it. It's not in this brief. No. We are simply arguing the impropriety of the grant of the motion for summary judgment on the facts of this case involving the payments according to a schedule to which they assented. But if I understood your argument right, you've left whatever $100,000 on the table. Yes. Okay. I don't want to. But you had a choice. Yes. Okay. Okay. When you're ready. Good morning, Your Honors. Thomas Hudson on behalf of the Appley Honeywell. The district court, Judge Sedwick, in this case, correctly concluded that Honeywell did not breach the MSP agreements by terminating the contract. As the district court correctly noted, although the parties had a long history and SACSA was often delinquent, in the summer of 2002, it was the first time ever in the party's history where SACSA allowed the termination date for the contract to pass after it had been declared in default without either curing or reaching an agreement for a repayment schedule. But let me ask you about what happens right after that, because I think if Honeywell had cut them off right there, it could have stood on a pretty clean record. But it didn't stop there. There was subsequent payment, subsequent communication by Honeywell that, well, if we get them in the next few days, we won't close this off. And you can argue about what agreement that constitutes, but I think we have to look at that period. Justice Hudson, I'm glad you raised that, and let's walk through that. That's what people usually say when you get an uncomfortable question. Okay. I expected that we would talk about that. That's what this case is about. And, again, I think the district court correctly analyzed that, and I'd point to that order. But in the end of July, Honeywell sends the default letter. This wasn't the first time SACSA received a letter like that. August 6, Mr. Roseberry of Honeywell sends a letter saying, you're in default, we're going to terminate this contract at the end of August. We will postpone termination if we can reach agreement on some catch-up payments. And Judge Clifton, your comment was correctly read. This was money that was already over 60 days due and owing. And he laid out, Mr. Roseberry laid out a payment schedule and said, we need you to comply with the schedule, but we'll postpone termination if we can reach agreement and if these payments are made. That's a question I have. Was an agreement ever reached? An agreement was never reached, Judge Hogg. In fact, the record facts are no agreement reached. The defaults and the subsequent payments can't really be considered, can they? I'm sorry, they can't be? Considered. I think that's one sort of legally sound analysis of this case is that, look, as of August 22, Honeywell had the absolute right to terminate the contract. But it didn't. It didn't. It did after that date. In other words, its right accrued on August 22. And nothing happened after that date that extinguished its absolute right to terminate the contract. Well, I don't know. We may have a waiver if they're being allowed to go ahead and make subsequent payments. Why isn't that a waiver? Okay. Let's talk about that. The reason it's not a waiver, and I think it's important to walk through the facts, but it's clearly not a waiver. Honeywell agreed to postpone at that time and said if payments are made. Now, the payments weren't made. Okay. So Honeywell's right never went away. Honeywell did agree to accept the first two payments slightly later than originally set forth in Mr. Roseberry's schedule. Both times Honeywell reiterated that the payments had to be made or the contract would be terminated. The last communication. In neither case did it do it. They did do it. Well, not in the first one, for sure. Well, one, perhaps, I don't think that matters for a couple reasons, Judge Hogg. First and foremost, this is Honeywell standing on its right saying we are going to terminate the contract unless we can come to an agreement. They agreed with the first two payments, but not the third and not the fourth to extend the time by which they can be made. Who agreed? Mr. Honeywell, representatives in SASCA, and if you want, I can point you to the record where that, where those agreements were reached. Yeah, but the other side didn't agree. Absolutely. I mean, what they said with the first, no agreement was reached. SASCA never accepted the schedule. Right. But Honeywell said, look, the first and second payment, we'll postpone those, but you have to stick to this payment schedule. And they reiterated that. And the last, the last communication is on September 25th in an e-mail from Honeywell to SASCA that says, look, the third and fourth payments have to be made on time or we will terminate. And that communication was more than, occurred more than ten days before, before Honeywell terminated. And that was the first time in those. And that right to terminate dates back to August? In my view, it does, Your Honor, because I think the, I think sort of the cleanest and I think the correct legal analysis is that Honeywell obtained the absolute right on August 22nd to terminate, and nothing subsequent changed that right. But even if we assume. Unless it was waived. Unless it was waived. Well, let's assume, and I don't, I think, again, I think the district court correctly analyzed it, that right accrued. Honeywell was insisting on its rights throughout this process and kept insisting that the payments be made on time. Only the, the only concession Honeywell made was with respect to the first two payments in Mr. Roseberry's letter. There was no agreement to postpone the third payment, and there was no agreement to postpone the fourth payment. And before the deadline of the third payment, Honeywell reiterated in writing to SACSA, you have to strictly comply with this date or we will terminate the contract. That e-mail went out 10 days, more than 10 days, it was 15 days, before Honeywell terminated the contract. And so even if you assume there's a waiver, under Honeywell's contract, it, you know, it says you go into default after 60 days, we can give you 10 days' notice and you can terminate. This is a commercial agreement. This is the, this is the kind of situation, you know, Honeywell was trying to work with the customer, but it had the absolute right under the terms of its agreement to cancel the contract as of that date. Are you arguing that they might have waived by allowing the extension in August, but it was a conditional waiver? And the condition of the waiver in the end was not fulfilled? Judge Fletcher, in our view, there was no waiver. But I think. But what if I think there was? If we assume there was a waiver, I think that's another, an alternative analysis. If we assume, argue and know that there was a waiver, yeah, absolutely. I mean, another way to look at this, sort of another simple way to look at this, is what Honeywell said is all this money is past due and owing. You have until, you have until October 15 to pay all the money that's past due and owing. That doesn't happen. And before that date, more than 10 days in advance, Honeywell says if it's not paid, if these payment dates aren't met, we're going to cancel. So even if we assume, Judge Fletcher, that there was a waiver, we don't think there was, again. But if you assume there was, absolutely. You can look at it that way as well. So either analysis, we think Honeywell absolutely had the right to terminate the contract, and the district court correctly found. What about this puzzle about all this later money that you've kept? Could you explain that? I can. And, yeah, it's, Judge Clifton correctly noted that a bunch of money was due and owing. It was due and owing back to June. So it was 60 days late when the default letter went out. And then by the time we're in October, it's, you know, like 120 days late. It's money that's due and owing. After Honeywell, after Honeywell terminated the contract, after the third and fourth payment deadlines had been missed for all this money that's been long due and owing and they've been warned it's going to be terminated, after that date, SACSA wires into a Honeywell general account several payments that totaled several hundred thousand dollars. Honeywell, of course, has business with SACSA in the parts department, other contracts. This contract had already been terminated. Honeywell said, don't post this money. Let's contact SACSA and figure out what they want us to do with it. But the MSP contracts have already been terminated. SACSA instructed Honeywell at that time to hold the money and ultimately post it to other accounts. And the details of this are not in the record, but essentially SACSA was operating aircraft for two Mexican government entities, and apparently the Mexican government under Mexican law can't directly make payments to a U.S. company. So, but SACSA was the one who was responsible for this money. So SACSA says, Honeywell, post this money to these other accounts. So what this money that was paid, it was A, it was paid after the contract that was in default. Honeywell asked SACSA what to do with it. If you look in the supplemental, our supplemental excerpt of record, you'll see this correspondence where Honeywell is saying, SACSA, we're going to send this, we're going to write you a check for this money. And then there's correspondence saying, no, no, pay it to these other accounts. Long story short, Honeywell never posted it to the MSP account, never accepted it for that purpose. A creditor always has the right to, when you get unspecified money, apply it to whatever accounts it wants. It then acted under SACSA's direction in terms of how to post this. And that's not an issue in this, it's not an issue raised on appeal, so. I know it's not raised on appeal. Okay. But anyway, and I think that frankly explains why, because. So you're understanding they did ultimately pay more money than they owed for this contract, but that money got applied to other obligations. It was paid after the contract was canceled and never applied to the contracts here. Unless the Court has further questions, we would ask the Court to affirm. Thank you. All right. Response? Nope. Take your time. Your time starts to run only after you start to talk, so you can walk up here slowly. You would think after 58 years of walking I could do it without tripping on level concrete and spraining my ankle. Let's put two minutes on the clock, and then we'll see where we go from there. Okay. Thank you, Your Honor. I'll be very quick in this two minutes. First time in history that this has ever happened, that is not so. The record does not support this. What the record supports is that there was a default, and then they would have an agreement, and they would either pay current before the due date, or they would have an agreement to make payments. What I understood was what the district court found, this is the first time that the agreement or the payment hadn't been reached prior to the termination date. Well, we believe that the agreement had been made, and the best evidence of that agreement, the agreement was that we would be making time payments and paying them over time, and they were accepting them. And if I use the schedule, and this is the August 22 termination date, they proposed a schedule which you, client, never accepted. That is correct. So what was accepted? Well, what was accepted was the subsequent e-mails and phone calls between the parties where they said, okay, if you make the payment by this date, you're okay. Even the last payment on September 27 where Ms. Klott said, okay, if you make it next week, you're okay. And, in fact, we did. She didn't think we did, and so she suggested the acts. If you look at Paragraph 25 of Excerpt of Record Tab 3, that explains what Honeywell's view was as long as someone who was involved in one of these contracts was showing an intent to pay and bring current, they never defaulted these things. You have to read that in the context of what the intent of the parties was with these payments, intent being an intensely factual issue which cannot be resolved on a summary judgment. Hold the money for other companies. There is a factual dispute about that in the record, because the record shows that they could take about $200,000 of this money and bring up the Arrobanabras and the Bancomext contracts and bring them current. They then kept the other $100,000, which applied only to the contract which they had terminated. And so, in that instance, I think their actions speak louder than words, and I'm out of time. Okay. Thank you very much. And we may leave the courtroom. Is that all right? Yes, of course. Thank you very much for your argument. The case of Servicios Arias del Centro v. Honeywell International is now submitted for decision.
judges: Hug, W. Fletcher, Clifton